CARMICHALL et al. v. STANOLIND OIL & GAS CO. et al.

No. 6169.

Court of Civil Appeals of Texas. Amarillo.
Sept. 22, 1952.

Rehearing Denied Oct. 27, 1952.

Price Daniel, Atty. Gen., Robert Hughes, Asst. Atty. Gen., Bryan, Stone, Agerton & Parker, Fort Worth, for appellants.

Turner, Rodgers, Winn, Scurlock & Terry and Thompson, Knight, Wright & Simmons, Dallas, Phillips, Trammell, Edwards & Shannon, Fort Worth, for appellees.

PITTS, Chief Justice.

This is a suit to remove cloud from title to three tracts of land totaling approximately 370 acres situated in Garza County, Texas, by seeking a revocation and setting aside alleged awards attempted to be made of the same as vacant unsurveyed school land by Honorable Bascom Giles, Commissioner of the General Land Office of Texas, on August 2, 1949, to F. L. Carmichall and Lee W. Davis. Appellees, Stanolind Oil & Gas Company, Seaboard Oil Company, Republic Natural Gas Company, each being a corporation of the State of Delaware with permits, respectively, to do business in Texas and having offices in this State, and George Beggs, an individual, filed suit on August 24, 1949, against Carmichall and Davis, alleging title to the said land in themselves and seeking to cancel, revoke and set aside the alleged purported awards and made the said Land Commissioner and the Honorable Price Daniel, Attorney General of Texas, party defendants to the suit and caused each of them to be served as required by Article 5421c, Section 6, Subdivision (j), Vernon's Annotated Civil Statutes. The action was tried before the court without a jury and judgment was rendered for appellees as party plaintiffs cancelling the alleged awards, together with any and all patents pursuant thereto, from which judgment all the party defendants perfected an appeal except Lee W. Davis and his interest in the matter is before us by reason of the appeal perfected by the Attorney General and the Land Commissioner.

The law governing such a matter says in part:

Subdivision (j) "Any person, firm, or corporation aggrieved by any action taken by the Commissioner under the provisions of this Act, or with reference to any application to purchase or lease vacancies, may institute suit in the District Court of the county where any part of the land is situated, but not elsewhere, and there try the issues of boundary, title and ownership of any alleged vacancy involved * * * ."

Subdivision (e) " * * * no presumption shall obtain in any suit involving the existence of a vacancy, as a result of the action of the Commissioner in this respect [that is, the claiming of a vacancy]."

The record is a voluminous one consisting of three volumes of statement of facts and six volumes of exhibits well and consistently bound, together with the transcript. It reveals that the land in question is located within an original unified survey made by an authorized surveyor by the name of John E. Elgin during July and August of 1873 which survey included Block 2, T. & N. O. Ry. Co. Survey and Block 5, G. H. & H. Ry. Co. Survey, from which unified survey Elgin prepared and filed field notes for the lands situated in the said Blocks based on sufficient ground locations there made by him. In 1901, under the direction of the Commissioner of the General Land

Office and in accordance with the field notes and the monuments found on the ground of the Elgin survey, F. M. German, Garza County's official surveyor, made a ground survey of the alleged common line between Blocks 2 and 5. These are the surveys upon which appellees here rely for recovery. German fixed the said line by prorating the excess distances north-south and east-west between Elgin's ground monuments found in Blocks 2 and 5 and appellees contend that the land in question is the excess land there prorated. Appellants concede that:

"* * * German prorated the excess allocating 72 varas per section between the southwest corner of Section 79 of Block 5 and the southwest corner of Section 37, Block 2. His is the only survey in Block 5 which can be used to locate Elgin's lines and therefore it is agreed that the corners of Block 5 as shown by German must be accepted."

(Both corners above referred to are still marked by stone monuments placed there by Elgin during his original survey). However, appellants rely for recovery upon a survey later made in December of 1905 by George Williams in pursuance of the provisions of an Act passed by the 20th Legislature April 2, 1887, Chapter 115, § 3, as a result of which survey Williams did not seek to align Block 2 with Block 5. They contend that the Williams' survey was the only authorized resurvey made on the grounds to establish Elgin's locations made and that the Williams' survey therefore established the official boundary lines. Appellants further contend that no common line existed between Blocks 2 and 5 but that the land in question constituted vacancies existing between the said two Blocks. They admit the location of the east line of Block 5 by German to be correct but they contend that "the west line of Block 2 cannot be pulled over to meet the east line of Block 5".

Appellants charge, in effect, that the trial court erred in holding that the land in question was excess land, that no vacancies existed as claimed by appellants and that such purported vacancies would be in conflict with prior awarded or patented surveys. Appellants further charge that the survey lines of ten million acres of land will be disturbed and the rights of many people jeopardized if the trial court's judgment is permitted to stand. However, the issues here presented are determined by the facts presented in this case and they will have no bearing upon any other action unlike the one at bar.

Upon request the trial court made and filed its findings of fact and conclusions of law in support of its judgment and such will be hereinafter referred to as they may apply.

Based upon his ground unified survey, Elgin filed in the State Land Office his field notes of Block 2, T. & N. O. Ry. Survey and Block 5, G. H. & H. Survey, as well as those of other blocks surveyed at the same time, on dates ranging from November 1873 to March 1874. In addition thereto he likewise prepared an official map reflecting all of his survey and filed it in the State General Land Office on December 20, 1873. Garza County was then a part of Scurry County and the said map appears in the General Land Office indexed as "Scurry County Rolled Sketch No. 1". Elgin's survey of Blocks 2 and 5 constituted a single system of surveys done at the same time or both done in August 1873 so near the same time as to constitute a single continuous survey. In Block 2 Elgin located Sections 1 to 72, both inclusive, and in Block 5 he located Sections 1 to 106, both inclusive. In each Block the sections were consecutively located with the field notes of each section calling successively for a corner or line of the preceding section.

Within less than two years after Elgin's survey was made of Blocks 2 and 5 all odd numbered sections therein about which we are here concerned were patented on Elgin's original field notes and those patents have never been changed, surrendered or modified. The even numbered sections in the said Blocks, as located by Elgin, are therefore locked in place by the odd numbered patented sections therein definitely established. Some even numbered sections at

least in Block 2 were sold on Elgin's field notes before the George Williams survey was made.

The trial court made findings consistent with the foregoing statements and it further found, based upon sufficient evidence of probative force to support such, that the section lines established by Elgin about which we are here concerned along the west boundary of Block 2 were common lines with the section lines along the east boundary of Block 5, including a jog which made the north-south section lines common also along the said jog. The effect of such findings establishes a common boundary line between Blocks 2 and 5, thus supporting appellees' contention here made. In making his survey Elgin marked his ground traverse over Blocks 2 and 5 by stone monuments, some of which were still there in both Blocks, and other natural and artificial marks, such as trees and stakes, some of which trees are still standing. There appears to be at least six adjoinder calling points where Elgin called for Block 5 to adjoin Block 2 and thus form a common line between the two Blocks. Many other more recent maps on file in the State General Land Office show the existence of a common boundary line between Blocks 2 and 5. Some of them, including Elgin's survey and map, show the existence of the excess land here claimed by appellees. The method of prorating the excess land here claimed by appellees was approved by the State Land Commissioner who directed and approved the survey made by F. M. German in 1901. It conclusively appears that the original survey of Blocks 2 and 5 as located on the ground in 1873 by John E. Elgin, with the approval of the State Land Commissioner, formed a continuous survey that shows a common boundary line between the said two Blocks in which there existed the excesses in question. In view of such existing facts any consideration of the work of subsequent surveyors, German and Williams, must grow out of and be related to the original survey of the two Blocks in question by Elgin.

█ The rule of law has been well established that where an old survey is being retraced, excesses over course and distance calls between original monuments on the ground must be prorated among the various sections within a given block or system of surveys. Turner v. Smith, 122 Tex. 338, 361, 61 S.W.2d 792; Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 104 S.W.2d 1; Standefer v. Vaughan, Tex. Civ.App., 219 S.W. 484; Brooks v. Slaughter, Tex.Civ.App., 218 S.W. 632.

The resurvey made by German of the common line between Blocks 2 and 5 as previously located by Elgin was caused by a letter written to the State General Land Office on March 16, 1899, by H. C. Hord, an attorney of Sweetwater, Texas, enclosing a mere sketch of the said two Blocks certified to by German of date August 4, 1898. The said sketch or map, which purported to show conflicts and vacancies, was later filed in the General Land Office on April 8, 1899, but the said sketch or map was disapproved or rejected by the Commissioner of the General Land Office. The said commissioner returned the sketch to H. C. Hord with a notation that Block 5 could not be separated from Block 2 and that their lines must be kept adjacent. Hord was also directed by the Land Office to have a ground survey made and send the Land Office a sketch showing the ground situation of the land in question. With sufficient evidence to support it the trial court found that county surveyor, F. M. German, pursuant to the instructions of the General Land Office, in 1901 resurveyed on the grounds the common line between Blocks 2 and 5, certified the results to the Land Commissioner and filed a sketch or map of the ground survey in the State Land Office. The trial court further found that the said resurvey made by German was the first official ground survey made of the common boundary line located by Elgin between Blocks 2 and 5 and that German prorated Elgin's excess, both north-south and east-west, between the stone monuments placed by Elgin at the southwest corner of Section 79, Block 5 and the southwest corner of Section 37, Block 2, both of which monuments appellants admit are still there. However, as previously stated, the record reveals that the two Blocks are still tied together by other

permanent markers placed there by Elgin. In effect, the trial court found that German's resurvey of the line in question was a complete identification upon the ground of Elgin's true common line between Blocks 2 and 5 and such is amply supported by the evidence. Elgin's traverse marked sufficient common points to determine the common line, making only a theoretical location of it, while German officially resurveyed it on the ground and certified the results in accordance with Elgin's theoretical location.

■ Under the record here presented it is our opinion that the trial court was justified in concluding and holding that the land in question was excess land and that no vacancies existed. Gulf Oil Corporation v. Outlaw, 136 Tex. 281, 150 S.W.2d 777; State v. Ohio Oil Co., Tex.Civ.App., 173 S.W.2d 470; Theisen v. Stanolind Oil & Gas Co., Tex.Civ.App., 210 S.W.2d 417.

■ A brief summation of the record reveals that John Elgin surveyed the land in question in 1873 and made a theoretical location at least of the common line between Blocks 2 and 5; that F. M. German resurveyed the same, under the direction and with the approval of the State Land Commissioner in 1901, and made Elgin's locations on the ground by using Elgin's stone monuments still there existing; and that German prorated the land in question as excess land. German's reports filed in the Office of the State Land Commissioner and other reports thereafter filed in the Land Office showed the existence of the common line between Blocks 2 and 5 and the excess land. Under the doctrine announced in the foregoing cited authorities the common boundary line in question was irrevocably fixed between Blocks 2 and 5 at the position given by German's official ground resurvey. The attempt of the surveyor, George Williams, some four or five years later to relocate the said boundary lines between the said Blocks at different places from where German had placed them, or to pull the said Blocks apart, or to effect any boundary line changes of any nature, either with or without the approval of a subsequent State Land Commissioner, was not authorized by law. Such was so held under similar facts

and circumstances by the Supreme Court in the case of Turner v. Smith, supra, and the Court there cited the case of State v. Post, 106 Tex. 468, 169 S.W. 407, 408, in support of its holdings. The rule of law there announced was recognized with approval also in the cases of Logan v. Lee, Tex.Civ. App., 256 S.W. 952, and Anderson v. Corbett, Tex.Civ.App., 287 S.W. 66.

■ The Act passed by the 20th Legislature April 2, 1887, Chapter 115, upon which appellants rely, authorized the State Land Commissioner under certain existing conditions to have resurveys of certain lands made for the purpose of making proper corrections and it probably served well in some instances. But such Act did not authorize the disturbance of a common boundary line such as the one here existing according to the record presented. The Supreme Court of Texas in construing the said Act of the 20th Legislature, relied on here by appellants, in the case of State v. Post, supra, [106 Tex. 468, 169 S.W. 408] held that the Land Commissioner had the power to cause the Post land "to be resurveyed (that is, run out according to the field notes of the original survey); but neither the commissioner nor the surveyor had authority to so change the said field notes as to embrace lands not included in the original survey." Such being the rule it stands to reason that a resurvey could not change the boundaries of the original survey so as to exclude lands originally included. "No authority can be exercised by the commissioner of the general land office except such as is conferred on him by law." State v. Robison, Land Commissioner, 119 Tex. 302, 30 S.W.2d 292, 297. For the reasons stated it is our opinion that the trial court was justified in concluding that the German survey was binding and that it could not be disturbed by the Williams survey.

■ We further conclude that the law of estoppel does not apply in the case at bar. Appellants contend that appellees are estopped to claim lands beyond the lines of the George Williams survey. It is our opinion that the authorities they rely on do not support their position in the matters. Appellees and their predecessors base their

claims on Elgin's field notes and accepted German's ground survey definitely establishing Elgin's locations. They at no time surrendered their claims so made and did not ask for or rely upon the George Williams survey. Under the facts presented and the authorities cited and many other authorities that could be cited the doctrine of estoppel has no application to the case at bar.

A careful examination of the record reveals no reversible error. Appellants' points to the contrary are overruled and the judgment of the trial court is affirmed.